**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Miyoshi America, Inc.,[1] | ) | Case No. 26-90522 (CML) |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF EDWARD HOULIHAN, VICE PRESIDENT OF
THE DEBTOR, IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST DAY PLEADINGS**

I, Edward Houlihan, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Vice President of Miyoshi America, Inc. ("Miyoshi" or "Debtor"), the Debtor in the above-captioned chapter 11 case (the "Chapter 11 Case").

2.      I have been the Vice President of the Debtor since January 2020.  I am acutely familiar with the Debtor's business and financial affairs and have been responsible, together with the other members of the Debtor's senior management team, for devising and implementing strategies for the Debtor, including, *inter alia*, (a) understanding and shaping the business and financial affairs of the Debtor, (b) developing cash flow analyses and financial forecasts, and assessing the current and projected liquidity position of the Debtor, (c) exploring and implementing various current and future financial strategies for the Debtor, and (d) serving as a contact with the Debtor's creditors and vendors, among other things.

3.      Prior to assuming my current role as Vice President, I had also served as Executive Director of Finance, Human Resources, and Information Technology at Miyoshi from February 2019 through January 2020.  In that capacity, I led financial forecasting, budgeting, statutory and

---

[1] The Debtor in this Chapter 11 Case, along with the last four digits of the Debtor's federal tax identification number is: Miyoshi America, Inc. (0519).  The mailing address for the Debtor for purposes of this Chapter 11 Case is 110 Louisa Viens Dr., Dayville, CT 06241.

management reporting, and long-term business planning, among other things.  I also oversaw human resource strategy and directed all site information technology operations.

4.      Prior to joining Miyoshi, I was employed by Shiseido Americas Corporation for approximately twenty-eight years, during which time I held several roles, including: (a) Vice President of Finance and Controller, where I led the startup of Shiseido America's U.S. manufacturing operations, implemented cost management systems, and expanded OEM revenues; (b) Senior Vice President and Chief Financial Officer, where I provided oversight of Finance, Human Resources, Distribution, Planning, Customer Service, Purchasing, and New Product Development divisions; (c) President and Chief Operating Officer, where I maintained full responsibility for operations, production, and distribution across multiple owned and OEM brands and implemented cost-saving methodologies; and (d) Senior Vice President of Supply Chain Finance, where I served as the corporate officer and senior financial partner to Supply Chain and Operations, strengthened financial governance and operational continuity across plants, and led the regional cost-reduction program known as "STAR."

5.      Additionally, before joining Miyoshi, I also served as an independent management consultant, advising growth-stage and mid-market companies on expansion strategy, financial planning, and operational improvement.  In that capacity, I helped companies with financial modeling, budgeting, accounting, human resources, payroll, benefits administration, and regulatory compliance.  I also served as an Efficiency Officer for Vitaquest International, LLC, where I partnered with executive leadership to assess, redesign, and improve end-to-end business processes.  Through my over thirty years of experience in finance, operations, and executive leadership, I have developed substantial expertise in corporate management and guiding companies through periods of operational and financial transition.

6.      I hold a Bachelor of Business Administration degree in Accounting from Pace University.

7.      As a result of my experience with the Debtor as its Vice President, my review of public and non-public documents (including the Debtor's books and records), and my discussions

- 2 -

with other members of the Debtor's management team, I am thoroughly familiar with, and possess detailed knowledge of, the Debtor's business, financial condition, policies and procedures, day-to-day operations, and business affairs, including its assets, liabilities, operations, future plans, and books and records.

8.      Except as otherwise noted herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, discussions with and information provided to me by the Debtor's advisors or  employees who report to me in the ordinary course of my responsibilities or from the Debtor's retained advisors.  References to the Bankruptcy Code (as defined below), the chapter 11 process, and related legal matters are based on my understanding of such matters in reliance upon the explanations provided by Miyoshi's legal and financial advisors.

9.      I am duly authorized to submit this declaration (this "First Day Declaration") on behalf of the Debtor and I am above 18 years old.  If called upon to testify, I would testify competently to the facts set forth herein.

10.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), seeking to expeditiously consummate a prepackaged plan of reorganization.  The Debtor will continue to operate its business and manage its property and financial affairs as a debtor in possession during the Chapter 11 Case.

11.      I submit this First Day Declaration in support of the Debtor's: (a) voluntary petition for relief; and (b) "first-day" pleadings filed concurrently with this First Day Declaration (collectively, the "First Day Pleadings").[2]  The Debtor seeks the relief set forth in the First Day Pleadings to minimize the adverse effects of the commencement of the Chapter 11 Case on its business and operations.  I have reviewed the Debtor's petition and the First Day Pleadings and

---

[2] Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable First Day Pleadings or in the Plan (as defined below).

1758798502

have had the contents of such pleadings explained to me where necessary by the Debtor's advisors. Based on my understanding of the Debtor's business and its current circumstances, I believe that the relief sought therein is essential to ensuring the uninterrupted operation of the Debtor's business and to maximizing the value of the Debtor's bankruptcy estate for the benefit of its stakeholders.

12.     The primary purpose of the Chapter 11 Case is to address and comprehensively resolve alleged talc- and asbestos-related liabilities asserted against Miyoshi based on allegations that Miyoshi supplied talc products purportedly containing asbestos that allegedly caused harm to talc plaintiffs.  Although Miyoshi vigorously disputes all talc-related and asbestos-related liability, the escalating volume of talc litigation claims, associated *ad hoc* settlements, and ever-growing litigation costs have become unsustainable and have caused significant financial distress to Miyoshi, a company with limited and finite assets.  Accordingly, I believe that the filing of the Chapter 11 Case and the creation of a trust under sections 524(g) and 105(a) of the Bankruptcy Code for the benefit of holders of Talc Personal Injury Claims (as defined below) represents the most efficient and expeditious means for Miyoshi to reorganize and continue operating while also providing fair and equitable treatment to holders of current and future Talc Personal Injury Claims.

13.     The Debtor intends to achieve this goal by confirming the *Prepackaged Plan of Reorganization of Miyoshi America, Inc., Pursuant to Chapter 11 of the Bankruptcy Code*, dated March 13, 2026 (including all exhibits thereto and as may be amended, supplemented, or modified from time to time, the "Plan"), filed substantially contemporaneously with this First Day Declaration, pursuant to, among other things, sections 105, 524(g), and 1129 of the Bankruptcy Code.

14.     The Plan embodies the terms of a Plan Support and Restructuring Term Sheet, dated as of January 30, 2026 (the "Term Sheet").  The Term Sheet was finalized following months of intensive negotiations through 2025 and 2026 among the Debtor, the Debtor's parent Miyoshi Kasei, Inc. ("MKI"), the prepetition Ad Hoc Committee (as defined below), and the prepetition Future Claimants' Representative (as defined below).  In my view, without this Term Sheet and

the extensive arm's-length negotiations that produced it, the consensual resolution reflected in the Plan would not have been achieved.

15. Under the Plan, subject to confirmation and its effectiveness, a section 524(g) trust will be created and funded by the Reorganized Debtor through a $19 million cash contribution and a $1 million promissory note. As consideration for these contributions, the Plan also provides for the issuance of the Talc Personal Injury Channeling Injunction prohibiting holders of Talc Personal Injury Claims from asserting claims against the Reorganized Debtor, MKI, and the other Protected Parties arising from Miyoshi's sale of talc prior to its emergence from the Chapter 11 Case.

16. As noted above, Miyoshi vigorously disputes any and all talc-related or asbestos-related liability. However, the costs associated with continuing to litigate and settle the Talc Personal Injury Claims, even at de minimis amounts, are simply not sustainable for Miyoshi's continued operations. Accordingly, I believe that Miyoshi's reorganization through the Chapter 11 Case (and the creation of a trust under sections 105 and 524(g) of the Bankruptcy Code) represents the most comprehensive and efficient means for Miyoshi to manage its litigation costs, sustain its business activities and also provide a potential recovery for holders of current and future Talc Personal Injury Claims. I understand that the tools and protections available under chapter 11 will facilitate the process leading to the confirmation of the Plan, and I am confident that this path will provide a resolution for both Miyoshi and its stakeholders.

17. Part I of this First Day Declaration provides an overview of the Debtor's business, talc-related liabilities, and the events leading to the filing of the Chapter 11 Case. Part II sets forth the relevant facts in support of the First Day Pleadings.

## PART I

### I. DEBTOR AND BUSINESS OVERVIEW

#### A. Background of the Debtor

18. The Debtor is a domestic company, incorporated in the state of Texas, that processes and sells specialized ingredients (such as pigments, composites, and substrates) to cosmetic manufacturers, who then use them to improve the look, feel, and durability of makeup

1758798502

and other beauty products.  The Debtor was incorporated in 1985 as "U.S. Cosmetics Corp." and in 1997, merged with "Miki America, Inc." with Miki America acquiring the assets of U.S. Cosmetics Corp., under the name of U.S. Cosmetics Corp.  In 2016, U.S. Cosmetics Corp. changed its name to "Miyoshi America, Inc."  The Debtor's sole equity holder is MKI.

19.     The Debtor produces ingredients for cosmetics manufacturers.  Its primary business involves treating raw and intermediate materials with special ingredients to give them qualities that are more favorable for consumer cosmetics products.  The Debtor treats substrates (*i.e.*, base ingredients that undergo transformation to support other compounds) to change how the materials behave in a given cosmetic formula and on the skin.  The Debtor purchases these substrates (particularly iron oxides and titanium dioxides) from other manufacturers or suppliers and treats them so that they can be used for cosmetic products, particularly for the enhancement of color pigments and the improvement of product duration and feel.  In short, the Debtor makes and treats cosmetic ingredients such as color pigments so they perform better, last longer, and feel better on skin, which are attributes preferred by many cosmetic manufacturers for their products.  In addition, the Debtor manufactures a line of ingredients used in sunscreen products.

20.     The Debtor primarily operates out of its owned headquarters in Dayville, Connecticut.  In addition, the Debtor rents a lab and sales office in Valley Cottage, New York pursuant to a lease agreement with Valley Cottage Owner, LP, which runs through November 30, 2031.  The Debtor remains current on all taxes, utilities, and property-related costs with respect to its property in Dayville as well as all amounts owed under its leased facility in New York.

21.     Since its inception, the Debtor has operated and continues to operate as a standalone business with its own board of directors (on which I serve) and an independent management team (of which I am a member in my capacity as Vice President).  The remainder of the board of directors consists of Taizo Miyoshi and Tim (Kaoru) Takagi, who also serves as the Chief Executive Officer of Miyoshi.

22.     The Debtor also employs another approximately 62 employees who work at its facilities in Dayville, Connecticut and Valley Cottage, New York.  As part of the Debtor's First

Day Pleadings, the Debtor seeks authority to continue to pay and provide its employees their salaries and other benefits in the ordinary course of business.

**B.      Summary of the Debtor's Assets and Liabilities**

23.      The Debtor's assets consist of real estate, equipment, several cash accounts, accounts receivable, raw materials, inventories, certain prepaid expenses, certain intangible assets (such as intellectual property) and goodwill, and other tax assets that collectively have a book value of approximately $30.7 million.

24.      Miyoshi's sole source of funded debt is its Prepetition Loan (as defined below) with its parent, MKI.  Specifically, on June 10, 2025, the Debtor and MKI entered into an Intercompany Loan Agreement pursuant to which MKI advanced a loan with an original principal amount of $3,000,000 (the "Initial Prepetition Loan").  The Initial Prepetition Loan was intended as an emergency stop-gap measure while alternative financing options were sought and evaluated.  On August 1, 2025, the Debtor and MKI entered into an Intercompany Loan and Security Agreement (as subsequently amended, the "Prepetition Loan Agreement"), pursuant to which MKI agreed to refinance the Initial Prepetition Loan and fund up to $7,000,000 of additional loans, for a total facility amount of $10,000,000 (the "Prepetition Loan").  Ultimately, because the Debtor was unable to identify an alternative source of funding, on January 27, 2026, the Debtor and MKI entered into an amendment to the Prepetition Loan Agreement which increased the size of the facility to $15,000,000.  As of the date of this First Day Declaration, the outstanding principal amount of the Prepetition Loan Agreement is $15 million.  The Debtor does not have any funded debt other than the Prepetition Loan.

25.      The loans funded under the Prepetition Loan Agreement accrue interest at an applicable rate of 7.50% per annum and are secured by perfected first-priority liens on substantially all assets of the Debtor, including pursuant to applicable UCC financing statements, a recorded real estate mortgage, and filings with the U.S. Patent and Trademark Office.

26.      The proceeds of the Prepetition Loan are used to fund the Debtor's daily working capital needs for its operations and have also been used to satisfy part of its talc-related litigation

1758798502

costs and expenses.  To ensure that the Debtor can continue operating after the filing of the Chapter 11 Case and also fund its reorganization efforts, the Debtor, as part of its First Day Pleadings, is seeking Bankruptcy Court approval of an agreement with MKI to provide a DIP Financing Facility (as defined in the DIP Motion referenced below), which will consist of an additional $5 million of new financing, plus a "roll-up" of the Prepetition Loan (which I understand will have the effect of converting the Prepetition Loan into a DIP loan).  This financing arrangement was the result of extensive, arm's-length negotiations between the Debtor and MKI that were undertaken in connection with a marketing process pursued by the Debtor's investment banker, Smith Goffman Partners.

27.     The proposed order seeking approval of the DIP Financing Facility also reflects an agreement between the Debtor and MKI regarding the use of Cash Collateral (as defined in the Bankruptcy Code).  The Debtor expects that between the access to the additional liquidity provided under the DIP Financing Facility and cash flow from continued ordinary course operations, the Chapter 11 Case will be adequately financed and the Debtor will be positioned to continue operating its business with minimal disruption.

28.     In addition to its funded debt, the Debtor incurs trade debt in the ordinary course of business, with numerous suppliers and vendors in connection with the sourcing and distributing of the Debtor's products sold to and utilized by its customers.  A majority of these suppliers and vendors conduct business with the Debtor via purchase order rather than pursuant to long-term purchase agreements, and are paid on prearranged terms.  The Debtor is substantially current with respect to its unsecured trade debt and estimates that as of the date of this First Day Declaration, approximately $2.65 million of supplier and trade debt is outstanding.  As part of its First Day Pleadings, the Debtor seeks authority to pay or otherwise satisfy all vendor and service provider claims in the ordinary course.

## II.      LITIGATION AND EVENTS LEADING TO THE CHAPTER 11 FILING

### A.      Talc Personal Injury Litigation

29.      Historically, a small component of the Debtor's business (approximately 5% of sales) has involved the sale of surface-treated talc-based cosmetics ingredients.  Talc is a natural clay mineral that has been used in cosmetics, powders, paints, and pharmaceuticals, including as a lubricant or coating, due to its moisture-absorbing properties.  The vast majority of talc can be used safely.  The Debtor purchased its talc-based products from suppliers in Japan.  Due to decreasing demand throughout the industry, the Debtor began to scale back its talc-based offerings in the early 2020s, and it fully discontinued sales of talc-based products in mid-2025.

30.      Some talc that is distributed in the market—particularly certain non-cosmetic talc—can be contaminated with asbestos or similar minerals that are known or believed to cause mesothelioma and potentially other illnesses.  To my knowledge, Miyoshi has never dealt in talc-based products containing any talc other than cosmetic talc.  The Debtor has always operated in compliance with industry best practices; prior to discontinuing sales of talc-based products, it required its suppliers to test their talc and talc-based products for asbestos contamination and provide the test results to the Debtor.  The Debtor is not aware of ever having purchased or sold talc-based products contaminated with asbestos.

31.      Additionally, the Debtor routinely tested talc-based products it received in accordance with industry standards.  Specifically, the Debtor consistently employed the widely accepted "CTFA J4-1" method of testing which relies on X-Ray diffraction, a testing form that analyzes how X-rays scatter across crystal structures and give way to unique patterns to show contamination.  None of the Debtor's testing of any talc-based products produced, purchased, or sold by the Debtor, ever indicated any contamination with asbestos.  Further, the Debtor provided written notices to its customers to perform supplementary testing in connection with their orders and shipment of talc-based products.  The Debtor has never received a record of anyone discovering asbestos contamination in talc-based product provided by the Debtor following any customer's supplementary testing.

1758798502

32.     Nevertheless, the Debtor is currently named as defendant in approximately 270 personal injury cases asserting that the Debtor's talc-based products were contaminated with asbestos, resulting in the development of mesothelioma (or similar allegations).  The first such case was filed against the Debtor in 2015.  Additional similar cases were filed against the Debtor continuing in 2017 and 2018, but the number of cases was small, and the costs of defending (successfully) against those cases were manageable.  However, beginning in 2022, the pace of filings against the Debtor accelerated, with five cases filed in 2022, thirty-five cases filed in 2023, thirty-four cases filed in 2024, and 167 cases filed in 2025.  To my or the Debtor's knowledge, no employee of the Debtor has ever developed mesothelioma, and no such claims have ever been asserted against the Debtor.

33.     The Debtor has been overall successful in resolving the talc cases filed against it without trial, through dismissal, grants of summary judgment, or settlement, and has never had a judgment entered against it in a mesothelioma case.  However, the costs of defending against the growing number of cases has become unsustainable and, by mid-2025, litigation costs had resulted in an insurmountable strain on the Debtor's liquidity.

34.     Ultimately, the Debtor does not believe that any of its products were ever contaminated with asbestos, contends that the Talc Personal Injury Claims are entirely without merit, and maintains that all of its talc-based products were safe.  Moreover, Miyoshi has never produced non-cosmetic talc-based products, such as products ultimately sold as "baby powder" or other similar non-cosmetic body powders, foot powders, or similar.  The Debtor has never had a case filed against it asserting the types of claims that are often asserted in connection with body powder products, such as claims that its products caused ovarian cancer.

35.     The Debtor's decision to pursue a global resolution of Talc Personal Injury Claims under section 524(g) was ultimately prompted by the growing number of filed Talc Personal Injury Claims, coupled with: (i) increased settlement demands with respect to pending Talc Personal Injury Claims; (ii) the anticipated projected future Talc Personal Injury Claims; and (iii) based on investigation to date, the limited availability of insurance coverage (if any) for the defense and/or

resolution of Talc Personal Injury Claims.  I believe such costs were becoming unsustainable and that absent such filing, they would completely erode Miyoshi's remaining liquidity and ultimately stifle operations entirely.  The Debtor would have likely had to stop operations and liquidate in the near term, which I believe would have resulted in the loss of employee jobs and reduced or eliminated recoveries to holders of Talc Personal Injury Claims.

**B.      Retention of Restructuring Advisors, Prepetition Negotiations with Talc Representatives, and Entry into the Term Sheet**

36.      Since late 2024, Mayer Brown LLP has been acting as national talc litigation defense counsel for the Debtor.  As a result of the growing level of asserted Talc Personal Injury Claims and the costly litigation and growing settlement costs, the Debtor subsequently retained Mayer Brown as restructuring counsel in early 2025.  The Debtor then engaged Alvarez & Marsal North America, LLC as financial advisor and claims consultant, and Smith Goffman Partners as restructuring advisor and investment banker, in April and May 2025, respectively.  The Debtor also retained PolicyFind, an insurance archaeology firm, to investigate whether the Debtor had any unknown insurance policies that could provide coverage for asbestos-related claims, including the Talc Personal Injury Claims.

37.      The Debtor, together with its advisors, began exploring, among other options, the viability of using bankruptcy to address the present and future Talc Personal Injury Claims by channeling the claims into a trust created under sections 524(g) and 105(a) of the Bankruptcy Code, which would be structured to ensure fair and equitable treatment of present and future claimants while relieving the Debtor of the ongoing financial and practical burdens of continuing to defend Talc Personal Injury Claims through the tort system for the foreseeable future.

38.      In July 2025, the Debtor directed its advisors to begin reaching out to law firms that represented plaintiffs asserting Talc Personal Injury Claims against the Debtor to discuss potential options for resolving such claims.  Between July and September 2025, the Debtor entered into confidentiality and non-disclosure agreements with seven such firms: Belluck Law LLP, Dean Omar Branham Shirley, LLP, Levy Konigsberg LLC, Maune Raichle Harley French & Mudd,

LLC, Meirowitz & Wasserberg, LLP, Simmons Hanly Conroy LLP, and Simon Greenstone Panatier, PC.  In September 2025, seven firms organized into the Ad Hoc Committee, which at the time, collectively represented more than 85% of the holdings of pending Talc Personal Injury Claims: Belluck Law LLP, Dean Omar Branham Shirley, LLP, Levy Konigsberg LLC, Maune Raichle Harley French & Mudd, LLC, Meirowitz & Wasserberg, LLP, Simmons Hanly Conroy LLP, and Simon Greenstone Panatier, PC.  In January 2026, an eighth law firm, SWMW Law, joined. As of March 2026, these eight firms represent approximately 90% of filed cases against MAI. The Ad Hoc Committee engaged Caplin and Drysdale as bankruptcy counsel, Gilbert as insurance counsel, and Province as financial advisor..

39.     The Debtor also evaluated options for engagement of a representative for individuals who may assert Talc Personal Injury Claims in the future, but whose asbestos-related diseases may not have manifested and are otherwise unknown to the Debtor (as more particularly defined in the Plan, "Demands"), which I understand is a key requirement in bankruptcy cases that effectuate the asbestos trusts.  In January 2026, the Debtor, with the approval of the Ad Hoc Committee, engaged Hon. Shelley C. Chapman (Ret.) to serve as the prepetition future claimants' representative (the "Prepetition Future Claimants' Representative").

40.     It is my understanding that Judge Chapman is a highly regarded retired United States Bankruptcy Judge, who oversaw numerous large and complex Chapter 11 cases as a bankruptcy judge and who has also acted as a court-appointed mediator to assist in the resolution of contentious Chapter 11 disputes, including those involving mass tort allegations.  I was informed that she also had prior experience acting as a future claimants' representative in previous and pending asbestos bankruptcy cases.

41.     The Debtor provided Judge Chapman and her advisors access to information and analysis provided by the Debtor's and the Ad Hoc Committee's financial advisors, in evaluating the Plan and related materials.

42.     The Ad Hoc Committee, the Prepetition Future Claimants' Representative, and their advisors, engaged in a months-long due diligence process beginning in the fall of 2025 and

- 12 -

continuing into early 2026.  The Debtor facilitated the investigation, which included, among other things, careful and independent review of the facts concerning the Debtor's historical involvement with talc, the nature and extent of the Debtor's talc- and/or asbestos-related liabilities, the projected value of the present and future Talc Personal Injury Claims, and the Debtor's insurance coverage. The investigation also covered both the Debtor's business and the background, nature, and scope of the Debtor's potential liabilities for the Talc Personal Injury Claims related to the talc-based products it sold.  To facilitate this process, the Debtor's advisors created and maintained a virtual data room in which requested documents could be easily shared with the Ad Hoc Committee's and Prepetition Future Claimants' Representative's advisors.  In connection with ongoing litigation, and in furtherance of plan negotiations, the Debtor also produced hundreds of thousands of pages of records to members of the Ad Hoc Committee and agreed to allow a representative of the Debtor to sit for a deposition conducted by a member of the Ad Hoc Committee.

43.     It is my understanding that the Ad Hoc Committee and Prepetition Future Claimants' Representative also evaluated the viability of estate claims against MKI, and in connection with this, reviewed information regarding transactions between the Debtor and its affiliates (including MKI), including intercompany contracts, sales of goods, license and royalty arrangements, and historical dividend payments from the Debtor to MKI.  The Ad Hoc Committee and Prepetition Future Claimants' Representative were also given access to certain financial information relating to MKI and its other non-Debtor subsidiaries including the Prepetition Loan Agreement and related agreements.

44.     Ultimately, the Debtor, Ad Hoc Committee, the Prepetition Future Claimants' Representative, MKI, and their respective representatives spent considerable time and effort negotiating a global resolution of Talc Personal Injury Claims to be implemented through a chapter 11 bankruptcy filing and the creation of a trust and channeling injunction under section 524(g) of the Bankruptcy Code.  These negotiations were rigorous, arm's-length, and conducted in good faith by all parties.  The settlement process focused on key aspects of the resolution, including the amount required to be contributed to the Talc Personal Injury Trust for satisfying Talc Personal

1758798502

Injury Claims, the breadth of the proposed channeling injunction (including the parties protected thereunder and scope of claims covered by the injunction), the assignment of certain potential insurance assets and related causes of action to the Talc Personal Injury Trust, and the terms on which MKI would maintain its equity interests in the Reorganized Debtor upon the Effective Date of the Plan. Without these extensive and contentious negotiations, I firmly believe that the settlement embodied by the Plan and the recoveries provided therein would not have been achieved.

45.     Following months of settlement discussions between and among the parties, including the exchange of numerous incremental term sheet drafts and several in-person and virtual meetings, on January 30, 2026, the Ad Hoc Committee presented the Debtor with a proposed final Plan Support and Restructuring Term Sheet (the "Term Sheet"), executed by each member of the Ad Hoc Committee. Shortly thereafter, the Debtor, MKI, and the Prepetition Future Claimants' Representative agreed to, and countersigned, the Term Sheet which outlined the resolution of the Talc Personal Injury Claims on the terms outlined below (among others):

- **Talc Personal Injury Trust**: On the Effective Date of the Plan, a Talc Personal Injury Trust will be created and funded by, among other things: (a) a cash contribution by the Debtor on its own behalf and on behalf of its non-debtor affiliates in the amount of $19,000,000 (*i.e.*, the Miyoshi Effective Date Cash Contribution); and (b) a promissory note issued by the Reorganized Debtor to the Talc Personal Injury Trust on the Effective Date with a stated principal amount of $1,000,000, and a maturity date of six (6) months following the Effective Date and the note to be secured by a first-priority lien on 50.1% of the equity interests of the Reorganized Debtor. Certain potential insurance rights and Assigned Causes of Action will also be assigned to the Talc Personal Injury Trust.

- **Talc Personal Injury Channeling Injunction**: Effective as of the Plan's Effective Date, the issuance of a permanent injunction channeling all Talc Personal Injury Claims and Demands against any Protected Party to the Talc Personal Injury Trust will be issued in accordance with sections 524(g) and 105(a) of the Bankruptcy Code. The Talc Personal Injury Trust will assume sole responsibility for processing and resolving all Talc Personal Injury Claims and Demands, in accordance with the Plan and the Plan-related documents.

- **Issuance of Equity in Reorganized Debtor to MKI**: In consideration of, among other things, its funding of the Miyoshi Effective Date Cash Contribution, MKI will be issued 100% of the equity interests in the Reorganized Debtor (again, subject to the rights of the Talc Personal Injury Trust in connection with the Miyoshi Promissory Note and related pledge agreement).

46.     Following the parties' entry into the Term Sheet, and after continued good faith and arm's-length negotiations, the Debtor, MKI, the Ad Hoc Committee, and the Prepetition Future Claimants' Representative agreed to, among other things, the terms of the Plan, the Disclosure Statement, the terms of the Talc Personal Injury Trust Agreement and Talc Personal Injury Trust Distribution Procedures, and to support confirmation of the Plan in accordance with the terms thereof.

47.     The Debtor, Ad Hoc Committee, the Prepetition Future Claimants' Representative, and Stretto, Inc., the Debtor's claims, solicitation, and noticing agent (the "Claims Agent") worked diligently and deliberately to devise a comprehensive and thorough prepetition solicitation process which was carefully designed to avoid the procedural pitfalls that I have come to learn have undermined solicitation efforts in other talc-related bankruptcies.  The Ad Hoc Committee took an active and vigilant role in ensuring all necessary protocols were firmly in place to properly locate and identify all Talc Personal Injury Claimants, that only authorized attorneys of record could vote on behalf of individual claimants, that all parties received complete solicitation packages, that voting instructions and Ballots were clearly and unambiguously drafted, and that all those eligible to vote on the Plan had ample time to meaningfully consider their vote.  The parties' legal advisors devoted substantial time and care to ensure a process that was rigorous, transparent, and fully protective of claimant rights.  After these safeguards were firmly established, and the Plan Proponents agreed to the solicitation procedures (as well as the other components of the solicitation packages), the Debtor authorized the Claims Agent to begin solicitation on March 13, 2026.

48.     I believe that the prepetition Term Sheet and fully negotiated Plan embodying the terms of such settlement will provide for the swift and orderly resolution of this Chapter 11 Case. The settlement agreed to in the Term Sheet has enabled the Debtor to commence the Chapter 11

1758798502

Case with a pre-packaged, fully consensual Plan that, if confirmed, will permanently and comprehensively resolve the Debtor's liability for the Talc Personal Injury Claims for the benefit of holders of Talc Personal Injury Claims (as well as for the benefit of the Debtor and the other Protected Parties).  In my professional judgment, this outcome would not have been achievable without the months of dedicated negotiation that produced the Term Sheet.

49.     In light of the funding provided through the MKI Cash Contribution, which would not be available to the Debtor (or to holders of Talc Personal Injury Claims) without the releases and comprehensive agreement embodied in the Plan, I believe that there will be substantially more assets available to pay Talc Personal Injury Claims than if the Debtor were to try and satisfy its obligations out of its daily cash flow, or liquidate its assets.  Such contribution is a direct product of the Term Sheet negotiations between the Debtor, the Ad Hoc Committee, and the Prepetition Future Claimants' Representative.

50.     Without the releases, settlements, and distribution procedures agreed to and contained in the Plan and the related Trust Documents, (a) the Debtor would likely face liquidation in the near term, thereby causing the loss of jobs for all approximately sixty-two Miyoshi employees, (b) current holders of Talc Personal Injury Claims would likely receive little to no recovery on account of their claims, and (c) future holders of Demands that may not manifest an injury for years to come would receive nothing.  I believe the relief sought herein is necessary to prevent these outcomes and that the Debtor's requests are entirely reasonable given the circumstances.

51.     As reflected in the *Declaration of Clarissa D. Cu Regarding the Tabulation of Votes to Accept or Reject Miyoshi America, Inc.'s Prepackaged Chapter 11 Plan*, solicitation of the Plan was successful, with more than 99% of Holders of Talc Personal Injury Claims voting to accept the Plan.  As I understand it, this is more than sufficient to satisfy the general confirmation requirements under the Bankruptcy Code, as well as the particular requirements set forth in Section 524(g) of the Bankruptcy Code related to the creation of an asbestos claims trust and issuance of a channeling injunction.  This also is a strong reflection of the significant prepetition efforts

undertaken and the broad consensus reached among the parties.  Accordingly, I believe that the commencement of this Chapter 11 Case and ultimate confirmation and implementation of the Plan presents the optimal path for resolving the Talc Personal Injury Claims in a fair and efficient manner that will maximize value for all stakeholders while also allowing the Debtor to continue operating its otherwise profitable business.

**PART II**

52.     In furtherance of the objective of preserving value for all stakeholders and maintaining normal business operations, the Debtor is seeking approval of the First Day Pleadings and related orders (the "Proposed Orders"), and respectfully requests that the Court enter the Proposed Orders granting the relief sought in the First Day Pleadings.

**I.      PROCEDURAL MOTIONS**

- **Disclosure Statement and Confirmation Hearing Motion:** *Debtor's Emergency Motion for (I) Entry of an Order (A) Scheduling Combined Hearing on the Adequacy of Disclosure Statement and the Confirmation of Plan; (B) Conditionally Approving Disclosure Statement; (C) Approving Solicitation Procedures and Form and Manner of Notice of Commencement, Combined Hearing, and Objection Deadline; (D) Fixing Deadline to Object to Disclosure Statement and Plan; (E) Conditionally (i) Directing the United States Trustee Not to Convene Section 341 Meeting of Creditors and (ii) Waiving Requirement of Filing Statements of Financial Affairs, Schedules of Assets and Liabilities; and (II) Granting Related Relief*

- **Future Claims Representative Motion:** *Debtor's Motion for Entry of an Order (I) Appointing the Hon. Shelley C. Chapman (Ret.) as Future Claimants' Representative Effective as of the Petition Date and (II) Granting Related Relief*

- **Claims Agent Application:** *Debtor's Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Stretto, Inc. as Claims, Noticing, and Solicitation Agent*

- **Top Creditor List/Notice Procedures Motion:** *Debtor's Emergency Motion for an Order: (I) Authorizing the Debtor to File a List of Lead Law Firms with Talc Claims Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors; (II) Approving Certain Notice Procedures for Talc Claimants; (III) Authorizing the Debtor to Redact Certain Personally Identifiable Information of Natural Persons; and (IV) Granting Related Relief*

- 17 -

## II.   FINANCING MOTION

- **DIP Motion:** *Debtor's <u>Emergency</u> Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, and (C) Grant Liens and Provide Superpriority Administrative Expense Claims, (II) Granting Adequate Protection to Prepetition Secured Party, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*

## III.   OPERATIONAL MOTIONS

- **Cash Management Motion:** *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtor to (A) Continue to Operate Its Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms and Books and Records; and (II) Granting Related Relief*

- **Wages Motion:** *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief*

- **Trade Vendor Motion:** *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtor to Pay Certain Prepetition Claims in the Ordinary Course of Business; (II) Granting Administrative Expense Priority to All Outstanding Orders; and (III) Granting Related Relief*

- **Utilities Motion:** *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Approving the Debtor's Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*

- **Tax Motion:** *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief*

- **Insurance Motion:** *Debtor's <u>Emergency</u> Motion for Entry of an Order (I) Authorizing the Debtor to (A) Continue Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies; and (II) Granting Related Relief*

53.     I am familiar with the content and substance of the First Day Pleadings.  I have reviewed each of the First Day Pleadings, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best

of my knowledge, information, and belief, and each such factual statement is incorporated herein by reference.

54.     Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enabling the Debtor to make the transition to, and operate in, chapter 11 with minimal interruptions and disruptions to its business or loss of productivity or value including loss of employment, (b) constitutes a critical element in the Debtor being able to successfully maximize value for the benefit of its estate, and (c) is both reasonable and necessary under the circumstances. Without the agreements reached in the Term Sheet and the comprehensive negotiations that preceded this filing, the Debtor would not be in a position to propose a consensual plan, and creditors—including holders of Talc Personal Injury Claims—would face the prospect of little or no recovery.

55.     Failure to grant the relief requested in any of the First Day Pleadings may result in immediate and irreparable harm to the Debtor, its business, and the Debtor's estate, and would jeopardize the carefully negotiated settlement that makes any meaningful recovery possible for Talc Personal Injury Claimants.  Accordingly, for the reasons set forth herein and in each of the respective First Day Pleadings, I respectfully submit that the relief requested is both reasonable and necessary, and the Court should grant the relief requested in the First Day Pleadings.

## CONCLUSION

56.     The Debtor's ultimate goal in the Chapter 11 Case is to confirm the Plan providing for the establishment of the Talc Personal Injury Trust pursuant to sections 105 and 524(g), allowing for the settlement contributions, trust funding, and other mechanisms set out in detail in the prepackaged Plan that will address all current and future Talc Personal Injury Claims asserted against Miyoshi, while simultaneously preserving value and allowing the Debtor to emerge from chapter 11 free of talc-related liabilities.  I believe this goal is achievable only because of the Term Sheet and the months of arm's-length negotiations that made this consensual resolution possible. The relief sought in the First Day Pleadings is necessary to preserve the value of the estate and to ensure that the benefits of those negotiations can be realized for the benefit of all stakeholders.

1758798502

57.     In the near term, however, to minimize any loss of value during this Chapter 11 Case, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the early stages of the Chapter 11 Case, with as little interruption or disruption to the Debtor's operations as possible.  I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and confirmation of the Plan will be substantially enhanced, and the recovery made possible by the Term Sheet negotiations will be preserved for the benefit of all holders of Talc Personal Injury Claims.

58.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of April 2026.

/s/

Edward Houlihan
Vice President
Miyoshi America, Inc.

1758798502